**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
      *Plaintiff-Appellant,*

      v.

BARRY LAMAR BONDS,
      *Defendant-Appellee.*

No. 09-10079

D.C. No.
3:07-cr-00732-SI-1

OPINION

Appeal from the United States District Court
for the Northern District of California
Susan Illston, District Judge, Presiding

Argued and Submitted
September 17, 2009—San Francisco, California

Filed June 11, 2010

Before: Mary M. Schroeder, Stephen Reinhardt and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Schroeder;
Dissent by Judge Bea

8553

**COUNSEL**

Barbara Valliere, San Francisco, California, for the plaintiff-appellant.

Dennis Riordan, San Francisco, California, for the defendant-appellee.

## OPINION

SCHROEDER, Circuit Judge:

In 2001, Barry Bonds hit 73 home runs for the San Francisco Giants. Also in 2001, as well as in prior and succeeding years, BALCO Laboratories, Inc. in San Francisco recorded, under the name "Barry Bonds," positive results of urine and blood tests for performance enhancing drugs. In 2003, Bonds swore under oath he had not taken performance enhancing drugs, so the government is now prosecuting him for perjury. But to succeed it must prove the tested samples BALCO recorded actually came from Barry Bonds. Hence, this appeal.

The government tried to prove the source of the samples with the indisputably admissible testimony of a trainer, Greg Anderson, that Barry Bonds identified the samples as his own before giving them to Anderson, who took them to BALCO for testing. Anderson refused to testify, however, and has been jailed for contempt of court.

The government then went to Plan B, which was to offer the testimony of the BALCO employee, James Valente, to whom Anderson gave the samples. Valente would testify Anderson brought the samples to the lab and said they came from Barry Bonds. But the district court ruled this was hearsay that could not be admitted to establish the truth of what James Valente was told. *See* Fed. R. Evid. 802. Accordingly we have this interlocutory appeal by the United States seeking to establish that the Anderson statements fall within some exception to the hearsay rule.

The district court also ruled that because Anderson's statements were inadmissible, log sheets on which BALCO recorded the results of the testing under Bonds' name, were also inadmissible to prove the samples were Bonds'. The government challenges that ruling as well.

We have jurisdiction pursuant to 18 U.S.C. § 3731 which authorizes government interlocutory appeals of adverse evidentiary rulings. We review for abuse of discretion and affirm.

## I.  Background

BALCO Laboratories, Inc. was a California corporation that engaged in blood and urine analysis, and was located in San Francisco. In 2003, the IRS began to investigate BALCO, suspecting the company of first, distributing illegal performance enhancing drugs to athletes, and then, laundering the proceeds. In September 2003, the government raided BALCO and discovered evidence which it contends linked both trainer Greg Anderson ("Anderson") and BALCO to numerous professional athletes. One of these athletes was professional baseball player and Defendant Barry Bonds ("Bonds"). The government also found blood and urine test records which, it asserts, established that Bonds tested positive for steroids.

On multiple occasions Anderson took blood and urine samples to BALCO Director of Operations James Valente ("Valente") and identified them as having come from Bonds. According to Valente, when he received a urine sample from Bonds, he would assign the sample a code number in a log book, and then send the sample to Quest Diagnostics ("Quest") for analysis. Quest would send the result back to BALCO. BALCO would then record the result next to the code number in the log book. Also, according to Valente, BALCO would send Bonds' blood samples to LabOne & Specialty Lab ("LabOne") for analysis. The government seized the log sheets from BALCO, along with the lab test results.

Before the grand jury in the probe of BALCO, the questioning by the government focused extensively on the nature of Bonds' relationship with Anderson. Bonds testified that he had known Anderson since grade school, although the two had lost touch between high school and 1998. In 1998, Ander-

son started working out with Bonds and aiding him with his weight training. Anderson also provided Bonds with substances including "vitamins and protein shakes," "flax seed oil," and a "cream." According to the government, some or all of these items contained steroids. Anderson provided all of these items at no cost to Bonds. Bonds testified he took whatever supplements and creams Anderson gave him without question because he trusted Anderson as his friend. ("I would trust that he wouldn't do anything to hurt me."). Bonds stated that he did not believe anything Anderson provided him contained steroids. He specifically denied Anderson ever told him the cream was actually a steroid cream.

With respect to blood sample testing, Bonds testified before the grand jury that Anderson asked Bonds to provide blood samples on five or six occasions, telling Bonds he would take the blood to BALCO to determine any nutritional deficiencies in his body. Bonds said that he would only allow his own "personal doctor" to take the blood for the samples.

Bonds also testified he provided around four urine samples to Anderson and he believed the urine samples were also going to be used to analyze his nutrition. Anderson also delivered these samples to Valente at BALCO for analysis. ("Greg went [to BALCO] and dealt with it."). Bonds did not question Anderson about this process because they "were friends."

The government showed Bonds numerous results of blood and urine tests but Bonds denied ever having seen them before. Rather Bonds contended that Anderson verbally and informally relayed the results of any tests to him. Bonds stated that Anderson told him that he tested negative for steroids. ("Greg just said: "You're — you're negative."). Bonds trusted what Anderson told him. ("He told me everything's okay. I didn't think anything about it.").

With respect to the relationship between Bonds and Anderson, Bonds admitted to paying Anderson $15,000 a year for

training. Bonds stated that this payment was not formally agreed to. Rather, Bonds contended that he "felt guilty" and "at least [wanted to give Anderson] something." ("Greg has never asked me for a penny."). Bonds had several trainers and considered some of the trainers employees, but considered Anderson a friend whom he paid for his help. ("Greg is my friend. . . . Friend, but I'm paying you."). Bonds made his payments to Anderson in lump sums. In 2001, the year he set the Major League Baseball single season home run record, Bonds also provided Anderson, along with other friends and associates, a "gift" of $20,000. Bonds spent considerable time with Anderson in San Francisco but Bonds noted that Anderson only visited during weekends during spring training.

On February 12, 2004, a grand jury indicted Anderson and other BALCO figures for their illegal steroid distribution. Anderson pled guilty to these charges and admitted to distributing performance enhancing drugs to professional athletes. The government also commenced an investigation into whether Bonds committed perjury by denying steroid use during his grand jury testimony. Anderson, since that time, has continuously refused to testify against Bonds or in any way aid the government in this investigation and has spent time imprisoned for contempt.

## II.  Procedural History of this Appeal

On December 4, 2008, the government indicted Bonds on ten counts of making false statements during his grand jury testimony and one count of obstruction of justice. They included charges that Bonds lied when he 1) denied taking steroids and other performance enhancing drugs, 2) denied receiving steroids from Anderson, 3) misstated the time frame of when he received supplements from Anderson.

The next month, in January 2009, Bonds filed a motion in limine to exclude numerous pieces of evidence the government contends link Bonds to steroids. As relevant to this

appeal Bonds moved to exclude two principal categories of evidence: the laboratory blood and urine test results, and the BALCO log sheets of test results.

When the government sought to introduce as business records the lab test results from Quest (urine) and LabOne (blood) seized from BALCO, Anderson's refusal to testify created an obstacle. The essence of the government's identification proof was Anderson's identification of the samples to Valente as Bonds'. The government wanted to introduce Valente's testimony that Anderson told him for each sample that "This blood/urine comes from Barry Bonds," in order to provide the link to Bonds. Because the government was attempting to use Anderson's out of court statements to prove the truth of what they contained, Bonds argued that Anderson's statements were inadmissible hearsay and that the lab results could not be authenticated as Bonds' in that manner. *See* Fed. R. Evid. ("FRE") 802 ("Hearsay is not admissible except as provided by these rules or by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act of Congress.").

The government sought to fit the statements within a hearsay exception. In its response to the defense motion in limine the government countered that Anderson's statements were admissible as statements against Anderson's penal interest (FRE 804(b)(3)), as statements of a co-conspirator (FRE 801(d)(2)(E)), and, alternatively, as admissible under the residual exception (FRE 807). At oral argument and in supplemental briefing before the district court, the government advanced two additional rationales as to how the court could admit the blood and urine samples: as statements authorized by a party (Anderson's statements authorized by Bonds) under FRE 801(d)(2)(C), or as statements of an agent (Anderson as Bonds' agent) under FRE 801(d)(2)(D). The court held that the government, as the proponent of hearsay, had failed to prove by a preponderance of the evidence that any of the exceptions or exemptions applied. *See Bourjaily v. U.S.*, 483

U.S. 171, 175 (1987) (holding that proponent of hearsay must prove exception or exemption by preponderance of the evidence).

The government also sought to introduce the log sheets from BALCO containing the Quest lab test results showing Bonds' urine testing positive for steroids, arguing that the log sheets were admissible as non-hearsay business records, or as statements of a conspirator, as statements against penal interest, or admissible under the residual exception to hearsay. The district court ruled the log sheets were also inadmissible to establish the samples tested were Bonds'. This appeal followed. On appeal, the government argues only that FRE 807, the residual exception, or FRE 801's exceptions for authorized statements (d)(2)(C) or for statements by an agent (d)(2)(D) apply.

## III.  Discussion

### A.  Admissibility of Anderson's Statements Under the Residual Exception to the Hearsay Rule

The district court held that FRE 807, the residual exception, did not apply. The court observed that it was designed for "exceptional circumstances." *See Fong v. American Airlines*, 626 F.2d 759, 763 (9th Cir. 1980). FRE 807, previously FRE 803(24), provides:

> A statement specifically not covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of jus-

tice will be served admission of the statement into evidence.

The court did not find Anderson's refusal to testify an exceptional circumstance because the effect was to make him an unavailable declarant, and FRE 804 already defines an "unavailable" declarant and lists exceptions to inadmissability that the government does not contend are applicable in this case.

**[1]** FRE 807 involves discretion. It exists to provide judges a "fair degree of latitude" and "flexibility" to admit statements that would otherwise be hearsay. *See U.S. v. Valdez-Soto*, 31 F.3d 1467, 1471 (9th Cir. 1994).

**[2]** Our sister circuits have also given district courts wide discretion in the application of FRE 807, whether it be to admit or exclude evidence. *See, e.g.*, *U.S. v. Hughes*, 535 F.3d 880, 882-83 (8th Cir. 2008) (upholding district court decision not to admit evidence under FRE 807); *FTC v. Figgie Intern. Inc.*, 994 F.2d 595, 608-09 (9th Cir. 1993) (upholding admission under residual exception even where trial court failed adequately to explain reasoning). Our research has disclosed only one instance where a circuit court reversed a district court to require admission of a statement under FRE 807. *See U.S. v. Sanchez-Lima*, 161 F.3d 545, 547-48 (9th Cir. 1998). However, the hearsay statements in that case were videotaped and under oath, and thus had indicators of trustworthiness that Anderson's statements do not. *See id*. More important, the circumstances were "exceptional" because the government had deported the witnesses, so the statements remained the only way the defendants could present their defense. Therefore, the government is asking this Court to take an unprecedented step in using 807 to admit the statements of a declarant who has chosen not to testify and whose statements lack significant indicators of trustworthiness.

The government argues that the district court adopted an improperly narrow view of FRE 807 by not taking into

account that Anderson's statements "almost" fell within several other hearsay exceptions. It also asserts the court did not give enough weight to Anderson's unavailability.

**[3]** The government contends that Anderson's statements "almost" met several other hearsay exceptions, and for that reason the district court erred in not admitting them under FRE 807. Specifically the government points out that Anderson's statements came close to qualifying as statements against his penal interest and statements of a coconspirator. The government relies on *Valdez-Soto*. In upholding the admission of out of court statements under the 807 exception in *Valdez-Soto*, we said that where a statement "almost fit[s]" into other hearsay exceptions, the circumstance cuts in favor of admissibility under the residual exception. *See* 31 F.3d at 1471. We did not, however, hold the factor was determinative, only that it supported the district court's application of FRE 807 in that case to admit the evidence. In this case, even though this was a "near miss" it was nevertheless a "miss" that may have permitted, but did not alone compel the trial court to admit Anderson's statements under FRE 807.

The government next suggests that Anderson's unavailability is "exactly the type of scenario" FRE 807 was intended to remedy, but cites no authority supporting the proposition. It argues the district court misunderstood the rule and applied it too narrowly. The district court, however, correctly noted that courts use FRE 807 only in exceptional circumstances and found this situation unexceptional because it involves statements of an unavailable witness like those FRE 804 excludes, with limited exceptions here not applicable.

**[4]** In addition, FRE 807 requires that the admissible statements have trustworthiness. The district court concluded Anderson's statements were untrustworthy, in major part because Valente admitted that he once mislabeled a sample when Anderson asked him to do so. To the extent the government contends that the district court improperly focused on

Valente's trustworthiness instead of on the trustworthiness of Anderson's statements, the government misinterprets the district court's opinion. The district court finding properly focused on the record of untrustworthiness of the out of court declarant, Anderson, as required under the rule. There was support for its conclusion that Anderson's statements about the source of samples were not trustworthy.

### B. Admissibility of Anderson's Statements Under 801(d)(2)(C) and (D).

**[5]** FRE 801(d)(2)(C) provides that a statement is a non-hearsay party admission if it "is offered against a party and is . . . a statement by a person authorized by the [defendant] to make a statement concerning the subject." FRE 801(d)(2)(D) provides that a statement is not hearsay if it "is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Subsection (C) thus requires the declarant to have specific authority from a party to make a statement concerning a particular subject. Subsection (D) authorizes admission of any statement against a party, but only provided it is made within the scope of an employment or agency relationship.

As a threshold matter, Bonds contends that the government did not preserve its arguments under either subsection, because the government failed to timely raise the issues in its response to the defense motion in limine to exclude the statements; the government raised them for the first time in oral argument on the motion in the district court, and then filed a supplemental brief. Bonds cites *U.S. v. Chang*, 207 F.3d 1169 (9th Cir. 2000), but *Chang* does not support Bonds' position. *Chang* states that if "a party fails to state the specific grounds upon which evidence is admissible, the issue is not preserved for review, and the court will review only for plain error." 207 F.3d at 1176 (citation omitted). *Chang* would bar a party from arguing for admissibility an appeal when it gave no justifica-

tion under the rules to support admissibility in the district court. *Chang* further suggests a party can not contend on appeal that admissibility would have been proper under a different rule from that advocated in the district court. In this case, however, the government argued the points and the district court allowed the government and Bonds to file supplemental briefs to address the new contentions. They are not raised for the first time on appeal. Although the government's brief contained little factual information explaining the extent and nature of Bonds' relationship with Anderson, and that doubtless contributed to the district court's adverse ruling on the merits, the government preserved the right to appeal the district court's ruling that Subsections C and D did not apply.

We turn first to the government's challenge to the district court ruling that the statements should not be admitted under Subsection (C) because Bonds did not specifically authorize Anderson to make the statements. Both parties agree that if the samples were Bonds', he *could* have authorized Anderson to make the statements. The question is whether the district court was within its discretion in ruling the record failed to establish sufficiently that he did.

**[6]** The government acknowledges it cannot establish that Bonds explicitly authorized Anderson to identify the samples as his. Bonds was never asked the question during his grand jury testimony and Anderson, of course, is unavailable. The government's position is, in essence, that by authorizing Anderson to act as one of his trainers, Bonds implicitly authorized Anderson to speak to the lab on his behalf. The conclusion does not follow from the premise.

**[7]** The district court correctly observed that certain relationships do imply an authority to speak on certain occasions. *See e.g.*, *Hanson v. Waller*, 888 F.2d 806, 814 (11th Cir. 1989) (stating that lawyers have implied authority to speak outside of court on matters related to the litigation). Athletic trainers, however, as the district court went on to observe, do

not traditionally have such any such implicit authorization to
speak. The government suggests that by allowing Anderson to
have the samples tested, Bonds impliedly authorized Ander-
son to identify them to BALCO, citing *United States v. Iaco-
netti*, 540 F.2d 574, 576-77 (2d Cir. 1976). In *Iaconetti*, the
defendant demanded a bribe from the president of a company.
*Id.* The court held that by demanding the bribe, the defendant
had provided implicit authorization for the president to dis-
cuss the bribe with his business partner. *Id.* Here, Bonds pro-
vided the samples after Anderson asked for them and thus
*Iaconetti* does not apply. There is no evidence of discussions
about how Anderson was to deal with the samples. The dis-
trict court could have quite reasonably concluded that Bonds
was accommodating the wishes of a friend rather than provid-
ing Anderson with "the authority to speak" on his behalf.

We cannot agree with the dissent's assertion that the nature
of the task of testing blood and urine samples implies that the
person who makes the necessary arrangements for the testing
and delivers the samples is authorized to identify the samples'
origin. Even assuming that Bonds allowed Anderson to have
his blood and urine tested in order to obtain medical informa-
tion rather than to accommodate Anderson's wishes, it was
not necessary for Anderson to reveal Bonds' identity to
accomplish that purpose. The samples could easily have been
identified by a number or a code word. Indeed, there are many
legitimate reasons to perform medical testing anonymously.
The dissent's conclusion that Anderson was impliedly autho-
rized to identify Bonds depends on the assumption that identi-
fying Bonds by name was the only way to ensure accurate test
results. Because we disagree with that assumption, we do not
find the dissent's reasoning persuasive.

The district court also expressly found that the government
had failed to carry its burden of showing that Bonds had pro-
vided Anderson the authority to identify the samples on each
particular occasion, because Bonds could not remember how
many samples he had provided. ("[Bonds'] equivocal answers

about the number of samples he gave Anderson are not suffi-
ciently certain to establish that Anderson had authority to
speak with regard to the particular samples at issue here.").
The district court thus concluded Bonds' lack of memory
about the number of samples militated against his having con-
ferred on Anderson authority to speak for each disputed sam-
ple in the case. Contrary to the government's theory, the court
was not suggesting Bonds should have had a perfect memory.

**[8]** The government also focuses on a district court remark
suggesting that to be admissible under Subsection C, the state-
ments had to have been against Anderson's penal interest. The
government is correct that had they been against Anderson's
penal interest they may have been admissible under a differ-
ent subsection of 801, but such a requirement does not appear
in Subsection C. The district court may have misstated Sub-
section C's provision i.e., that the statement be "offered
against a party," which these statements were, and incorrectly
suggested the statements had to qualify as admissions against
the penal interest of Anderson, which these statements were
not. Any such misstatement had no bearing on the court's rul-
ing, however, because the court clearly ruled that the govern-
ment failed to show the statements were authorized by Bonds.
It thus applied the correct standard. A tangential misstatement
does not transform the ruling into error. There was no abuse
of discretion in the court's refusing to admit the statements,
under FRE 801(d)(2)(C), as statements authorized by Bonds.

**[9]** We now turn to whether the statements, though not
specifically authorized, came within the scope of an agency
or employment relationship that permitted their admission
under FRE 801(d)(2)(D). That provision makes admissible "a
statement by the party's agent or servant concerning a matter
within the scope of the agency or employment, made during
the existence of the relationship." The district court rejected
the government's contention that Anderson's statements to
Valente are admissible under this provision. Again, we may

reverse only for abuse of discretion. *U.S. v. 4.5 Acres of Land*, 546 F.3d 613, 617 (9th Cir. 2008).

**[10]** To determine whether Anderson's statements are admissible under Rule 801(d)(2)(D), we must "undertake a fact-based inquiry applying common law principles of agency." *NLRB v. Friendly Cab Co., Inc.*, 512 F.3d 1090, 1096 (9th Cir. 2008). For Anderson's statements to fall under this exception, he would have to have been Bonds' employee or agent.

The government provides two arguments in favor of admissibility of Anderson's statements under Rule 801(d)(2)(D). First, it argues that the district court erred in finding that, as a general matter, Anderson's work as a trainer was not that of an employee or agent. Next, it contends that even if Anderson did not generally act as an employee or agent, he assumed the status of an agent for the purpose of delivering Bonds' blood and urine to BALCO. We cannot accept either argument.

**[11]** The record supports the district court's conclusion that Anderson was an independent contractor, rather than an employee. The parties briefed this issue under the Second Restatement of Agency, which sets forth ten factors that a court should consider: 1) the control exerted by the employer, 2) whether the one employed is engaged in a distinct occupation, 3) whether the work is normally done under the supervision of an employer, 4) the skill required, 5) whether the employer supplies tools and instrumentalities, 6) the length of time employed, 7) whether payment is by time or by the job, 8) whether the work is in the regular business of the employer, 9) the subjective intent of the parties, and 10) whether the employer is or is not in business. *Restatement (Second) Agency* § 220(2) (1958). Although the parties presented this issue primarily under the Second Restatement, we have independently reviewed the Third Restatement, which abandons the term independent contractor. *See Restatement (Third) Agency § 1.01 cmt. c.* We find nothing in the later

Restatement's provisions that would materially change our analysis or cause us to reach a different result than the district court.

**[12]** In applying the Second Restatement factors, a court will look to the totality of the circumstances, but the "essential ingredient . . . is the extent of control exercised by the employer." *Friendly Cab*, 512 F.3d at 1096 (internal quotation marks and citation omitted). Virtually none of the Second Restatement factors favor the existence of an employment relationship in this case. Most important, there is no evidence that Bonds directed or controlled any of Anderson's activities. To the contrary, the facts on record regarding the Bonds-Anderson relationship evidence a lack of control exercised by Bonds. For example, Anderson seemingly had free reign to provide Bonds whatever muscle creams and supplements he felt appropriate. Bonds took these items without question on the basis of his friendship with Anderson. Rather than exercise control over Anderson's training program, Bonds testified that he had a "Dude, whatever" attitude to Anderson's actions. These facts make it clear that Anderson was, as the district court found, not an employee.

Other elements of the Second Restatement test also point to Anderson's acting as an independent contractor, not an employee. For example, Anderson provided his own "instrumentalities" and "tools" for his work with Bonds. *See Restatement (Second) Agency* § 220(2)(e). All of the aforementioned creams and supplements came from Anderson, not Bonds. There is no evidence that Bonds supplied any type of equipment or material related to Anderson's training regimen. As a trainer, Anderson was engaged in a "distinct occupation." *See id.* § 220(2)(b). He had many different clients and offered his services to others during the same period. Moreover, it is important in this context that Bonds testified that he considered Anderson a friend and not an employee. *See id.* § 220(2)(i) (noting subjective intent of parties relevant to determining whether one is an independent contractor).

**[13]** The government is correct that certain, but limited, aspects of the Bonds-Anderson relationship may suggest an employer/employee relationship. For example, Bonds conceded that he paid Anderson annually, and not "by the job." *See id.* § 220(2)(g). Yet Bonds paid gratuitously, and not on the basis of any regular employment relationship. There is, thus, sufficient basis in the record to support the district court's conclusion that Anderson acted as an independent contractor rather than an employee.

**[14]** Unlike employees, independent contractors are not ordinarily agents. *See Dearborn v. Mar Ship Operations, Inc.*, 113 F.3d 995, 998 n.3 (9th Cir. 1997) (recognizing that "an independent contractor . . . may be an agent" in limited circumstances in which he acts "subject to the principal's overall control and direction"). The district court was therefore correct to conclude that "independent contractors do not qualify as agents for the purposes of Rule 801(d)(2)(D)" in the sense that evidence of an independent contractor relationship is *insufficient* in itself to establish an agency relationship for the purposes of the rule. *See Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1440 (9th Cir. 1990) (holding that statements of independent contractors were not admissible under Rule 801(d)(2)(D) when there was no showing that the contractors were also agents). However, a finding that a speaker is an independent contractor does not *preclude* a finding that the speaker is also an agent for some purposes.

The dissent thus incorrectly suggests the district court's ruling was the result of an incorrect application of a legal standard. We have of course observed many times that a district court abuses its discretion when it makes an error of law. *See, e.g.*, *Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1091 (9th Cir. 2010) (citing cases); *U.S. v. Hinkson*, 585 F.3d 1247, 1261-62 (9th Cir. 2009) (en banc). In this case, however, the district court did not base its ruling on a legal determination that independent contractors can never be agents. Rather the district court held that the government had not

shown that the task of identifying Bonds' samples was within the scope of any agency relationship.

Accordingly, we must now address the government's argument that even if Anderson was an independent contractor, he acted as an agent in delivering Bonds' blood and urine to BALCO. An agent is one who "act[s] on the principal's behalf and subject to the principal's control." *Restatement (Third) Agency § 1.01*. To form an agency relationship, both the principal and the agent must manifest assent to the principal's right to control the agent. *Id.*

**[15]** As is clear from the above description of Anderson's and Bonds' relationship, Anderson did not generally act subject to Bonds' control in his capacity as a some-time trainer, nor did he or Bonds manifest assent that Bonds had the right to control Anderson's actions as a trainer. There is no basis in the record to differentiate between Anderson's actions in his capacity as a trainer and his conduct in delivering the samples to BALCO. There is little or no indication that Bonds actually exercised any control over Anderson in determining when the samples were obtained, to whom they were delivered, or what tests were performed on them. Nor, contrary to the dissent's assertion, is there any indication that either Bonds or Anderson manifested assent that Bonds would have the right to instruct Anderson in these respects. It was Anderson who proposed to Bonds that he have his blood and urine tested. Bonds provided samples to Anderson when requested by the latter, and according to Bonds' testimony, "didn't think anything about it" after doing so. It was, further, Anderson who selected BALCO as the location for testing. In short, it was Anderson who defined the scope of the testing. Bonds provided Anderson no guidance or direction in terms of what specific tests BALCO would run on the samples. Bonds did not even inquire into the results of the tests. Rather, Anderson would, apparently on his own initiative, inform Bonds of results. The dissent says that Bonds instructed Anderson to deliver the samples to BALCO within 30 minutes of extrac-

tion, but this is not correct. The record shows that it was Anderson who told Bonds about the 30-minute time constraint. Moreover, the samples were taken at Bonds' house not because Bonds so ordered, but because his house was close to BALCO and taking the samples there made it possible for them to be delivered in time. Bonds quite understandably would allow only his own doctor to take the samples, but this does not show that he also had reserved the right to instruct Anderson as to what to do with the samples. *See Restatement (Third) of Agency § 1.01 cmt. f* (stating that the fact that a service recipient imposes some constraints on the provision of services does not itself mean that the recipient has a general right to instruct and control the provider).

**[16]** While the dissent focuses on whether, as a practical matter, Bonds had the "capacity" to assess Anderson's performance and give Anderson instructions as to how to have the testing performed, it ignores the key question: whether Bonds and Anderson ever agreed that Bonds could do so. These are very different inquiries. Any time one person does something for another, the latter is in all likelihood capable of evaluating and instructing the first. The Restatement provision on which the dissent relies makes it clear, however, that not all service providers and recipients stand in agency relationships. *Restatement (Third) of Agency § 1.01 cmt f.* Rather, as we have seen, an agency relationship exists only if both the provider and the recipient have manifested assent that the provider will act subject to the recipient's control and instruction. *Id.* The question whether Bonds had the ability, in a practical sense, to prevent Anderson from having the testing carried out similarly fails to resolve the question whether Anderson was Bonds' agent. Obviously Bonds could have put an end to the testing by refusing to provide Anderson with samples of his blood and urine, but that does not establish an agency relationship. There is nothing in the record that requires a finding that Bonds actually controlled Anderson with respect to the testing or that Bonds and Anderson had agreed that Anderson would be obligated to follow Bonds' instructions if Bonds

chose to provide them. Contrary to the dissent's contention, we do not maintain there needs to be an explicit agreement, but there must be at least some manifestation of assent to the principal's right to control. Here, the testing was performed on Anderson's own initiative and not at the request of Bonds. The dissent incorrectly assumes otherwise. Thus, the district court did not abuse its discretion in finding that Anderson was not an agent for the limited purpose of the drug testing.

The dissent incorrectly suggests our holding somehow conflicts with *Harris v. Itzhaki*, 183 F.3d 1043 (9th Cir. 1999) and *U.S. v. Jones*, 766 F.2d 412 (9th Cir. 1985). *Itzhaki* was a Fair Housing Act case in which we held that the jury, as trier of fact, should decide whether discriminatory statements were made by an agent of the defendant. *Id.* at 1054. That case has no relevance to the finding of a district court on a motion in limine. Our discussion is also fully consistent with *Jones*. There we found the district court did not abuse its discretion in admitting statements of 'bag men' in an extortion scheme. *Jones*, 766 F.2d at 415. *Jones* has no application to this case. The fact that this court deferred to a district court's decision to admit evidence in *Jones* does not compel us to refuse to defer to a district court's decision here and to admit Anderson's statements. Moreover, in this case the government was required to demonstrate that Anderson was an agent by a preponderance of the evidence. *See Bourjaily*, 483 U.S. at 175. The applicable burden of proof was lower at the time the court decided *Jones*. *See* 766 F.2d at 415 ("Evidence of agency must be substantial, although proof by a preponderance is not necessary.").

To the extent that the dissent looks beyond the relevant time period to rely on a claim that on May 28, 2003, Bonds "asked Anderson to have Bonds tested for steroids to protect himself against false test results," the claim is both irrelevant and misleading. The government's arguments on appeal pertain to lab results from 2001 and 2002. What Bonds asked Anderson to do in 2003, is not relevant. The statement is mis-

leading because the record only shows that, on that date, after being required to submit to a steroids test by Major League Baseball, Bonds told Anderson that he was suspicious of the test and that he "want[ed] to know what baseball's doing behind our backs." The dissent infers from this that Bonds must have asked Anderson to verify the test results by having BALCO independently test Bonds for steroids, but this is not the only possible interpretation of Bonds' testimony. In any event, it sheds no light on the nature of Bonds' and Anderson's relationship with respect to the tests performed in 2001 and 2002.

Although the district court might, in the exercise of its discretion, have reached a different decision, our standard of review is deferential, and we cannot say here that we are left with a "definite and firm conviction" that it made a "clear error in judgment" in ruling that Rule 801(d)(2)(D) did not apply. *4.5 Acres of Land*, 546 F.3d at 617. There was no abuse of discretion.

## C.   The Log Sheets

The district court excluded BALCO log sheets purportedly showing Bonds testing positive for steroids "because even if [the log sheets] qualify as business records, they are not relevant because the government cannot link the samples to [Bonds] without Anderson's testimony." The parties spar about whether this statement by the district court meant relevance in the literal sense that they did not on their face pertain to Bonds, or whether the district court meant they could not in fact relate to Bonds unless the data was authenticated as relating to Bonds. The district court meant the latter.

**[17]** The log sheets were business records reflecting that BALCO recorded test results in the name of Barry Bonds. The records themselves, however, go no further toward showing the actual samples came from Barry Bonds than Valente's testimony about what Anderson told him. If anything the logs,

when offered for the truth of the identification of the sample donor, created an additional level of hearsay rather than removing one. The district court did not abuse its discretion in refusing to admit the log sheets as evidence that the samples listed were Bonds'.

## IV. Conclusion

The district court's evidentiary rulings are **AFFIRMED** and the case is remanded for further proceedings consistent with this opinion.

---

BEA, Circuit Judge, dissenting:

I dissent.

At a pretrial hearing, the district court granted defendant Barry Bonds's motion *in limine* to exclude statements of James Valente. Valente was an employee of BALCO, a laboratory that tested Bonds's blood and urine for steroids. He testified that Greg Anderson delivered samples of blood and urine to BALCO, and while doing so, Anderson identified the samples as being Bonds's blood and urine.

Without doubt, Anderson's statements to Valente were out-of-court statements, offered to prove the matter asserted—that the samples came from Bonds—and were neither made under oath nor subject to cross-examination by Bonds. Although the statements appear to be hearsay, they are defined as not hearsay by Federal Rule of Evidence 801(d) because they are, in law, statements or "admissions" of a party-opponent.[1] The statements are not hearsay for two reasons that were incorrectly disdained, first by the district court, and then by the majority.

---

[1] Federal Rule of Evidence 801(d) begins: "A statement is not hearsay if—".

First, Anderson was an agent of Bonds; his statements to Valente concerned a matter within the scope of his agency; and, his statements were made during the existence of his agency. Rule 801(d)(2)(D).**²** Anderson acted as Bonds's agent for the collection of samples from Bonds, and in the delivery of those samples to BALCO for the purposes of their testing. Further, Anderson acted as Bonds's agent when he dealt with BALCO to procure the tests and the test results, and when he reported the results back to Bonds. Bonds's sole role was to give Anderson the samples. Everything else was up to Anderson and BALCO. Because the task Bonds entrusted to Anderson was to accomplish testing Bonds's blood and urine, from start to finish, Anderson's mid-task statements to Valente about *whose* samples were being tested concerned a matter within the scope of his authority as Bonds's agent. The statements were admissible in evidence as statements of Bonds— a party opponent to the United States—under Rule 801(d)(2)(D).

Second, a less frequently used rule: Anderson was authorized by Bonds to identify the samples as coming from Bonds under Rule 801(d)(2)(C). As it was normal and necessary to make sure accurate test results were procured, Anderson was impliedly authorized to identify the samples as coming from Bonds. Because Anderson made these statements for the purpose of insuring accuracy of the test results, they are imputed to party-opponent Bonds as authorized admissions, and were admissible in evidence against him under Rule 801(d)(2)(C).

The district court made several errors of law in granting Bonds's motion *in limine*, the most egregious of which was to hold that independent contractors are not agents as a matter of law. The majority compounds these errors by acknowledging the district court indeed erred, but then improperly reviewing that court's legal conclusion under a deferential

---

**²**All references to "Rules" or a "Rule" in this dissent refer to the Federal Rules of Evidence.

standard of review. The correct approach to this case, under our standard of review as expressed in *United States v. Hinkson*, 585 F.3d 1247, 1261-62 (9th Cir. 2009) (en banc), is first to identify whether the district court erred in identifying the correct legal standard or in applying the correct legal standard to the facts of a case. If the district court has so erred, then we do not defer to how the district court decided the case; we reverse—unless the error was harmless. Of course, no one claims an error in barring this evidence from admission is harmless.

Perhaps less egregious, but equally prejudicial in result, was the failure of the district court to identify and apply the correct rule of law to determine whether Anderson was authorized by Bonds to identify his samples to BALCO. Rather than consider the totality of the task entrusted by Bonds to Anderson—procure tests and their results—the district court characterized Anderson as solely a trainer and delivery courier. Failure properly to consider the task entrusted to Anderson by Bonds resulted in legal error under Rule 801(d)(2)(C).

## I.    Background

### A.    Procedural Background

Barry Bonds began playing professional baseball in 1985. He joined the San Francisco Giants in 1993, and in 2001 he set Major League Baseball's single-season home run record, hitting 73 home runs.

In 2003, the federal government began investigating the Bay Area Laboratory Corporation ("BALCO") and several individuals, including Bonds's trainer, Greg Anderson, for conspiracy to distribute steroids to professional athletes. The government executed a search warrant on BALCO's offices and seized laboratory reports and handwritten notes related to blood and urine tests of several individuals, including reports purporting to show Bonds tested positive for steroids.

On December 4, 2003, Bonds testified before a grand jury regarding Anderson and BALCO. Bonds denied he had taken steroids, at least knowingly. On December 4, 2008, a grand jury returned a second superseding indictment charging Bonds with ten counts of making false declarations before a grand jury and one count of obstruction of justice.

Bonds moved to suppress laboratory reports and other documents the government seized during a search of BALCO and other laboratories. The government contends these documents prove Bonds tested positive for steroids in 2001 and 2002.

The admissibility of the BALCO reports against Bonds depends on whether the government can prove the blood and urine tested were Bonds's. For this necessary proof, the government sought to introduce testimony from James Valente, a BALCO employee, that Anderson, Bonds's trainer and the man who brought blood and urine samples to BALCO, stated to Valente the blood and urine samples were Bonds's. The district court ordered excluded the BALCO reports before trial on the grounds the documents contained hearsay. From that order, this appeal followed.

## B.   Bonds and Anderson's Relationship

The following facts are drawn from Bonds's grand jury testimony: Anderson and Bonds have known each other since they met in grade school. They lost touch after high school, but reconnected in 1998. At that time, Bonds played for the San Francisco Giants; he began weight training with Anderson—a professional weight lifting trainer—as his coach. When Bonds testified to the grand jury in 2003, Bonds said he continued to work out daily under Anderson's coaching.

At some time in 2000 or 2001, Anderson suggested Bonds provide Anderson with samples of Bonds's blood and urine so Anderson could take the samples to be tested at BALCO and

then report the results to Bonds. Bonds testified the purpose of the tests was to show whether he was deficient in certain nutrients, such as zinc or magnesium. The information provided by these tests would help Bonds alter his diet to regulate his nutrient levels. Bonds testified that before 2003 he had no idea BALCO may have sent his samples to be tested for steroids.

Bonds provided Anderson with blood samples five or six times, between approximately 2000 and 2003. He provided urine samples approximately four times. Each time, Anderson procured and provided the vials into which Bonds's samples were to be placed. Bonds had his personal doctor, Dr. Teng, draw his blood and collect his urine at Bonds's home and put the fluids in the vials brought there by Anderson. Dr. Teng then gave the samples to Anderson, at Bonds's home. Anderson had to deliver the blood and urine samples to BALCO within 30 minutes; otherwise, the samples would not yield valid test results. Bonds knew Anderson would drive the samples directly from Bonds's house to the BALCO labs. Bonds testified he did not instruct Anderson to put Bonds's samples under Anderson's name or otherwise preserve Bonds's anonymity.

Later, Anderson told Bonds the tests came back and "everything is fine." Anderson did not give Bonds any written reports explaining the test results and Bonds did not request additional details. Anderson did, however, tell him how much food to consume and what vitamins to take.

At some point after Bonds began to provide samples to Anderson, Bonds visited BALCO's offices with Anderson. The BALCO offices were very close to the gym where they exercised together. While at the BALCO laboratory, Bonds met Victor Conte, the CEO of BALCO. Conte, Bonds, and Anderson discussed how testing Bonds's blood and urine would help Bonds regulate his nutrient levels. Bonds testified

they did not discuss any lotions or liquids that Anderson provided to Bonds.

During the 2003 season, Bonds was tested for steroids in two unannounced tests conducted by Major League Baseball. The government seized a document titled "NSIC Drug Testing Custody and Control Form," dated May 28, 2003, from Quest Diagnostic. Bonds testified the document was "one of my filled-out sheets from Major League Baseball."

The same day he was tested by Major League Baseball, Bonds specifically asked Anderson to have Bonds tested for steroids to protect himself against possible false test results. Bonds testified "I may have given [the Major League's document] to Greg [Anderson]. Because when I took the sample—when I took the test I wanted to make sure, like I said earlier, because I don't trust baseball, to make sure that they don't come back to me and try to say: 'X, Y, Z,' that I protect myself." In giving Anderson Major League Baseball's form, Bonds specifically directed Anderson to have BALCO verify or refute the results of Major League Baseball's steroids test. After the BALCO test results came back, Anderson told Bonds that Bonds had tested negative for steroids.

In May or June 2003, Bonds posed for photographs with Conte and sat for an interview as part of an advertisement for BALCO in Muscle & Fitness magazine. In the advertisement, Bonds discussed the "drawing of blood" and "being able to analyze your levels of your body." Bonds appeared in the advertisement for free. No one testified before a grand jury that BALCO charged Anderson or Bonds for the blood and urine testing.

In 2002 or 2003, Anderson began providing Bonds with a liquid Bonds testified was flax seed oil, and with a cream. Bonds testified Anderson administered the cream to Bonds directly, and did not give Bonds the cream for Bonds to use on himself. Bonds testified he never knew what the cream or

the liquid contained; Anderson never told him and Bonds never asked.

Bonds testified he never paid for the blood or urine testing, the cream, the flax seed oil, or any other product from Anderson or BALCO. Bonds did, however, pay Anderson $15,000 annually for Anderson's weight training services.[3] Bonds paid Anderson in cash, either in a single lump sum or sometimes "split up." Despite paying Anderson for several years, Bonds did not sign a contract with Anderson for his weight training services. After Bonds broke the single-season home run record, he gave Anderson, and several other people, such as his publicist, strength coach, and stretching coach, a $20,000 bonus each. After the 2002 season, Bonds gave Anderson, and several other people, a World Series ring, worth approximately $ 3,000. Bonds did not deduct any of these payments to Anderson from his taxable income.

## II.   Standard of Review

We review a district court's ruling excluding evidence for abuse of discretion. *United States v. Alarcon-Simi*, 300 F.3d 1172, 1175 (9th Cir. 2002). A district court must decide preliminary questions of evidence under Rule 104(b).[4] In criminal trials, the court must find a condition of fact, which constitutes such a preliminary question, by a preponderance of the evidence. *Bourjaily v. United States*, 483 U.S. 171, 176 (1987).

---

[3]Bonds also paid his two other trainers similar amounts. Unlike Anderson, Bonds testified he paid his other trainers as employees, but the similar, annual amount he paid Anderson was a "gift" because Anderson was Bonds's friend.

[4]Rule 104(b) states: "When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition."

> [T]he first step of our abuse of discretion test is to determine de novo whether the trial court identified the correct legal rule to apply to the relief requested. If the trial court failed to do so, we much conclude it abused its discretion. . . . [T]he second step of our abuse of discretion test is to determine whether the trial court's application of the correct legal standard was (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record. If any of these three apply, only then are we able to have a definite and firm conviction that the district court reached a conclusion that was a mistake or was not among its permissible options, and thus that it abused its discretion by making a clearly erroneous finding of fact.

*Hinkson*, 585 F.3d at 1261-62 (internal citations and quotation marks omitted).

If the trial court did not apply the correct legal standard, or its application of the correct legal standard to the facts was illogical, implausible, or without support in inferences that may be drawn from the facts in the record, then the trial court abused its discretion. *Id.* If the error was not harmless, then we must reverse. *Id.*

## III.    Analysis

### A.    Anderson's Statements Are Admissible Under Rules 801(d)(2)(D) (statements of an agent related to a matter within the scope of his authority) and 801(d)(2)(C) (authorized admissions).

The district court, and then the majority, err in holding Anderson's statements were hearsay. Statements made by a party's agent that are related to a matter within the scope of his agency or by a person's authorized speaker are not hearsay under Federal Rules of Evidence 801(d)(2)(D) and

801(d)(2)(C). Instead, such statements are considered admissions of a party litigant. The errors were not harmless and likely affected the outcome of the district court's decision whether to exclude the evidence. This is not a situation where overwhelming evidence supports the district court's holding, such that we should affirm despite the presence of one or two isolated errors in the district court's opinion. To the contrary, the evidence here strongly supports a finding that Anderson's statements were admissible in evidence because they (1) were statements about a matter related to a matter within the scope of Anderson's agency for Bonds, for the purposes of Rule 801(d)(2)(D); and (2) were impliedly authorized by Bonds as a necessary component to Anderson's task, for the purposes of Rule 801(d)(2)(C).

## B.  Anderson's Task

The district court and the majority's error, in holding that Anderson's statements are inadmissible under Rules 801(d)(2)(D) and (C), seems a consequence of their focus on Anderson's role as Bonds's trainer—a red herring—and their overly narrow characterization of the task the evidence proves Bonds entrusted Anderson to perform. It is not necessary for the government to rely on some professional label, such as trainer or coach, for Anderson's statements to be admissible. As I will discuss below, it is enough that Bonds authorized Anderson to be his agent for the purpose of the specific task of setting up tests and procuring accurate test results from BALCO, or, that Bonds authorized Anderson to make statements that would be usual and ordinary in accomplishing that task. For the sake of clarity, I set forth at the outset of this analysis a complete description of what I see as Anderson's task (the "Task").

Bonds assented that Anderson perform the following actions on Bonds's behalf: (1) procure the vials which were to contain the blood and urine samples, and furnish such vials to Bonds and Bonds's doctor; (2) once the vials were filled

with Bonds's samples, collect such samples from Bonds at Bonds's home; (3) deliver the samples to BALCO within 30 minutes of collection of the bodily fluids; (4) deal with BALCO to procure testing of the samples; (5) learn the test results from BALCO; and (6) report the test results to Bonds. For Anderson to accomplish this Task successfully, it was necessary for him to identify the samples in a manner that would later allow BALCO accurately to report test results to Anderson and for Anderson to know the results were truly of Bonds's samples, so he could accurately report to Bonds his BALCO results. Anderson's Task included each and all of the above-enumerated actions.

### C.   Anderson's Statements Are Admissible Under Rule 801(d)(2)(D) (statements of an agent concerning a matter within the scope of the agency or employment).[5]

"A statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship" is not hearsay. Rule 801(d)(2)(D). The district court made two errors of law and one error of fact in deciding Anderson's statements were not admissible into evidence under Rule 801(d)(2)(D). First, the district court erred—and the majority here agrees—as a matter of law in holding independent contractors could not be agents under Rule 801(d)(2)(D). Second, the district court erred as to a matter of law in holding Anderson's statements were inadmissible because making them was not *within the scope of Anderson's agency*, when the correct legal standard is whether an agent's [Anderson] statements *were related to a matter within the scope of his agency*. Finally, the district court erred as to a matter of fact in holding the government did not cite to any evidence of Bonds's relationship with Anderson and that there was no evidence that Bonds paid

---

[5]I begin with Rule 801(d)(2)(D) because it is more broad than Rule 801(d)(2)(C) and our courts have more fully developed what statements are admissible under this rule.

Anderson. The record is replete with evidence of Bonds's relationship with Anderson and that Bonds paid Anderson, regularly and significantly. These errors are not harmless and should compel us to reverse.

The district court erred as to a matter of law in holding: "In the Ninth Circuit, independent contractors do not qualify as agents for the purposes of Rule 801(d)(2)(D)." *United States v. Bonds*, No. 07-00732, 2009 WL 416445, at *5 (N.D. Cal. Feb. 19, 2009) (citing *Merrick v. Farmers Ins. Group*, 892 F.2d 1434 (9th Cir. 1990)). And there the district court stopped its analysis of Rule 801(d)(2)(D). We review de novo the legal issue whether independent contractors may qualify as agents for the purposes of Rule 801(d)(2)(D). *See Hinkson*, 585 F.3d at 1262. The majority correctly holds that finding an independent contractor relationship is not *sufficient* to show agency, but the majority also recognizes that such a finding does not *preclude* the existence of an agency relationship. Majority Op. at 8572. The majority is incorrect, therefore, in stating the district court identified the correct legal standard. *See* Majority Op. at 8571-72. On the contrary, based on the law and even on the majority's view of the law, the district court was wrong as a matter of law when it held independent contractors were *categorically* non-agents.

The one benefit of the majority's opinion on the independent contractor issue, is that it explains away the somewhat careless language in *Merrick* and clarifies that independent contractors may indeed be agents for the purposes of Rule 801(d)(2)(D). Majority Op. at 8571-72. Nevertheless, the majority still begins its analysis of that rule by citing *NLRB v. Friendly Cab Co., Inc.*, 512 F.3d 1090, 1096 (9th Cir. 2008), a decision that is entirely about distinguishing independent contractors from employees in the collective bargaining context and has nothing to do with those aspects of agency law that provide for the imputation of an agent's statement to his principal, here a defendant in a criminal case. The claim that independent contractors may not be *agents* for the pur-

pose of Rule 801(d)(2)(D) is a legal error; cases that distinguish between independent contractors and *employees* are not relevant to the definition of an *agent*.[6]

Because the district court erred as to a matter of law, we should review the record to determine whether its error was harmless; it was not. The evidence is sufficient to support a contrary finding: that Anderson *was* Bonds's agent. More than that, the evidence is compelling that Anderson's statements meet the requirements under Rule 801(d)(2)(D): Bonds's testimony shows that (1) Anderson was Bonds's agent for the Task; (2) Anderson's statements to Valente identifying the samples concerned a matter within the scope of the Task, hence Anderson's agency; and (3) Anderson made his statements during the existence of the agency relationship. Rather than categorically to have eliminated the possibility that Anderson could have been Bonds's agent because Anderson was an independent contractor, the district court should have applied the correct legal standards (see below) to the abundant evidence of Anderson's agency.

(1) *Anderson was Bonds's agent for the Task*. Agency is the fiduciary relationship that arises when one person, the principal, manifests assent to the agent for the agent to act on the principal's behalf and subject to the principal's control, and the agent agrees or otherwise consents. *Batzel v. Smith*, 333 F.3d 1018, 1035 (9th Cir. 2003); *accord* Restatement (Third) of Agency § 1.01 (2006). In short, agency requires (a) the principal's assent; (b) the principal's right to control; (c) the agent acting on the principal's behalf or benefit; and (d) the agent's consent.

---

[6]"The common law of agency . . . additionally encompasses the employment relation . . . . The common term 'independent contractor' is equivocal in meaning and confusing in usage because some termed independent contractors are agents while others are nonagent service providers . . . . This Restatement does not use the term 'independent contractor.'" Restatement (Third) of Agency § 1.01 cmt. c (2006).

(a) *Bonds assented to Anderson's performance of the Task.*
Bonds testified that he agreed to have Anderson take his
blood and urine samples to BALCO. Moreover, Bonds mani-
fested such assent not only to Anderson, but to BALCO, for
Bonds testified he met with Conte, CEO of BALCO, and
Anderson at BALCO's facilities. There, Conte, Bonds, and
Anderson discussed testing Bonds's bodily fluids and the con-
sequent results as to his nutrient levels. Bonds did not object
to Anderson's dealing with BALCO to procure the testing and
results discussed. Bonds also asked Anderson to have him
tested to check Major League Baseball's tests for errors.

(b) *Bonds had the right to control Anderson's performance
of the Task.* "The principal's right of control presupposes that
the principal retains the capacity throughout the relationship
to assess the agent's performance, provide instructions to the
agent, and terminate the agency relationship by revoking the
agent's authority." Restatement (Third) of Agency § 1.01 cmt.
f (2006). This is a key point of dispute between my analysis
and that of the majority; I think the evidence shows Bonds
had the capacity to control Anderson's performance of the
Task and the panel does not. Admittedly, Bonds testified he
did not exercise much supervisory authority over Anderson.
But our inquiry is not whether Bonds *exercised* his authority,
but only whether Bonds *had* the authority to exercise in the
first place. *Id.* cmt. c ("A principal's failure to exercise the
right of control does not eliminate it."). For example, just
because a movie actor does not exercise his right to reject a
screen role through his agent does not mean that he no longer
has an agent, or that he can no longer reject roles through the
agent.

Here, Bonds had the capacity to assess Anderson's perfor-
mance. For example, Bonds could have called BALCO to ver-
ify Anderson was procuring testing and successfully
delivering the samples within 30 minutes of collection. Or,
Bonds could have reviewed the test results documents.
Bonds's own testimony creates an inference that Bonds could

have done so: "So, I never saw the documents. I should have. Now that I think of it with the situation that is now, I should have." The fact that Bonds did not assess and modify or terminate Anderson's performance of the Task does not mean, as a matter of law, that Bonds lacked the *right* to do so.

Bonds also had the right to instruct Anderson. Not only did Bonds have that right, but he exercised it by instructing Anderson when and where Anderson was to collect Bonds's samples and when and where Anderson was to deliver the samples. The majority is correct that Bonds did not instruct Anderson regarding the 30-minute limit, but that limit did provide one measure by which Bonds could evaluate Anderson's actions. The point, however, is that Bonds did instruct Anderson when and where to collect his samples—at his home in San Francisco. The majority seems to argue that the fact that Bonds's house was also a suitable location under the 30-minute requirement is incompatible with Bonds's instructing Anderson, Majority Op. 8573-74, but that is illogical. There were many places they could meet that were within 30 minutes of BALCO; Bonds instructed Anderson to come to Bonds's house and not to another location, most likely because it was a private place where Bonds's personal doctor would be comfortable drawing his blood and collecting his urine. Further, Bonds controlled when he could be tested because Anderson could not complete his task without Bonds's samples.[7]

Moreover, the majority completely omits the fact that Bonds met with BALCO's CEO Conte to discuss, in Anderson's presence, the procedure for testing his blood and urine.

---

[7]The majority contends that Anderson's flexibility in administering creams to Bonds shows that Bonds did not exercise control over Anderson as his trainer. Majority Op. at 8571. Again, the Government does not need to rely on Anderson's relationship to Bonds as his trainer to show Anderson was Bonds's agent for the purposes of the Task. Moreover, Bonds had the *right* to exercise such control merely by telling Anderson not to rub cream on him.

This fact strongly supports the conclusion that Bonds was intimately familiar with BALCO's testing procedures, and therefore able to assess and instruct Anderson, even if he "didn't think anything about it" after doing so.

Most importantly, Bonds had the right and ability to terminate the agency relationship—a factor essentially ignored by the majority. Were Bonds to decide to terminate the relationship, he could simply have stopped giving samples of his blood and urine to Anderson. Without Bonds's samples, Anderson could not perform the Task. It would be implausible to find Anderson had access to some reserve of Bonds's blood or urine that he could have tested despite Bonds's terminating his agency relationship with Anderson. Besides, any such reserves could not meet the 30-minutes-from-draining "shelf life" requirement. The majority simply asserts, without explanation, that Bonds's right to terminate Anderson's role in dealing with BALCO was not enough to prove Bonds had control over Anderson's actions.

The majority also asserts Bonds and Anderson never manifested an agreement as to control. Majority Op. at 8573-74. I can only interpret this point to be based on the majority's confusion between the requirement that the principal and agent respectively manifest assent and consent to the agency relationship and the requirement that the principal has the right to control the agent's actions. The majority suggests there must be an explicit agreement between a principal and agent that the principal may control the agent's actions. There is no support for that claim in the Restatement or the law generally. The majority points to the Restatement (Third) of Agency's distinction between agents and service providers. § 1.01 cmt. f. Nothing in the comment to the Restatement section cited states how the principal and agent must manifest assent and consent to the right of control; to the contrary "[a] principal's power to give instructions" is "created by the agency relationship." *Id.* Further, none of the illustrations provided in Restatement (Third) of Agency § 1.01, comment f, mention

anything about an agreement as to control. Instead, the illustrations contemplate that an agent has a right to resign as the principal's agent if the agent does not wish to follow an instruction. *Id.* The reference to "service providers," relied on by the majority, is explained by turning to § 1.01, comment c, which distinguishes service providers on the basis that agents deal with third parties while service providers do not. *Id.* cmt. c. Here, Anderson dealt with a third party, BALCO; that is an attribute of an *agent*, not of a service provider.

By demanding affirmative evidence of a manifestation of assent and consent to the right to control, the majority puts the cart before the horse. As the Restatement explains:

> If the principal requests another to act on the principal's behalf, indicating that the action should be taken without further communication and the other consents so to act, an agency relationship exists. If the putative agent does the requested act, it is appropriate to infer that the action was taken as agent for the person who requested the action unless the putative agent manifests an intention to the contrary or the circumstances so indicate.

*Id.* cmt. c. Bonds requested Anderson act on his behalf by taking his samples to BALCO and having them tested.[8] Anderson did so. There is no evidence Anderson manifested an intention to refuse the Task, nor are there circumstances that indicate he did not consent. Therefore, the evidence gives rise to a compelling inference that Anderson acted as Bonds's agent, subject to Bonds's control.

The majority's application of the law of agency to the facts

---

[8]Bonds requested Anderson perform this act even though Anderson initiated the idea for testing Bonds. It does not matter who came up with the idea. Once Bonds decided he should be tested, he requested Anderson to perform the Task.

in this case imposes unwarranted obstacles to the government's showing that Anderson was Bonds's agent. The holding in this case is flatly inconsistent with how this court has handled similar cases in the past.

In *United States v. Jones*, 766 F.2d 412 (9th Cir. 1985), Jones appealed his conviction for interference with commerce by threats of violence under 18 U.S.C. § 1951. 766 F.2d at 413. Jones called Kelsay, an accounts representative at a savings and loan, and told her to pay him $65,000 or else he would kill her daughter. *Id.* Jones arranged to pick up the extortion money from Kelsay. *Id.* At the arranged time and place, two other men arrived and attempted to collect the extortion money. *Id.* Kelsay testified the two men made out-of-court statements that showed they were paid by a third man to collect a bag. *Id.* The prosecution introduced evidence that Jones was observed meeting with the two men shortly before they met with Kelsay. *Id.* at 415.

On those facts, we affirmed the district court's holding that the two men were Jones's agents and that their statements that they had been paid by a third man to collect a bag were admissible in evidence under Rule 801(d)(2)(D) to prove the truth of the matter the two men had asserted in their out-of-court statements. *Id.* There was no evidence the two men were employed or paid regularly by Jones. The court did not analyze whether the two men were independent contractors, and from the facts recited in the opinion, it is unlikely the two men would be employees. It was enough the two men were performing a task for their principal, defendant-Jones, and were talking about matters related to the scope of their task.

In *Harris v. Itzhaki*, 183 F.3d 1043 (9th Cir. 1999), Harris, an African-American woman, sued her putative landlords, the Itzhakis, for racial discrimination in letting an apartment, under the Fair Housing Act. 183 F.3d at 1049. Harris overheard Ms. Waldman, an elderly tenant who performed several tasks for the landlords, say to a repairman/gardener: "The

owners don't want to rent to Blacks." *Id.* at 1048. Harris complained to her local housing council based on Ms. Waldman's statement. In response, the housing council tested the Itzhakis' apartments for racial discrimination through the use of black and white fair housing testers. *Id.* The testers reported that the black tester was treated in a discriminatory manner based on her race. *Id.* The district court granted summary judgment against Harris on the ground that Harris failed to produce admissible evidence of racial discrimination. *Id.* at 1049.

We reversed, holding there was sufficient evidence from which a jury could reasonably find Ms. Waldman was an agent of the Itzhakis and that her statement that the Itzhakis did not want to rent to Blacks was admissible in evidence under Rule 801(d)(2)(D). *Id.* at 1054 ("[T]he question of agency should be submitted to the jury unless the facts are clearly insufficient to establish agency or there is no dispute as to the underlying facts."). Ms. Waldman assisted the Itzhakis by collecting rent checks and showing vacant units to prospective tenants; this evidence supported the finding of agency. *Id.* The court noted that Ms. Waldman received no payment or discount on rent for her services, but did not hold the lack of remuneration disqualified Ms. Waldman as an agent.[9] *Id.*

In *Jones* and *Itzhaki*, the evidence supporting a finding of agency was much weaker than it is in Bonds's case. In *Jones*, the defendant never testified he sent the two men to collect the swag from Kelsay; here, the entrustment of BALCO testing and reporting to Anderson is drawn directly from Bonds's own testimony.[10] In *Itzhaki*, the agent acted gratuitously, doing small favors for her landlords that did not even require

---

[9]In *Itzhaki*, the court afforded deference to the definition of agency provided by HUD regulations. *See* 24 C.F.R. § 100.20. That regulation defines agency in a manner that is consistent with the federal law of agency. *Itzhaki*, 183 F.3d at 1054.

[10]I acknowledge the applicable burden of proof on the government was lower in *Jones*. But, the case provides a clear example of an agency relationship in circumstances with much less evidence than in this case. *Jones* does not compel the majority to reverse, but it does show the majority's notion of agency is too narrow.

her to leave her apartment complex; here, Anderson's Task was much more significant—it required him to drive between Bonds's home in San Francisco and BALCO's offices in Burlingame at specific times, negotiate the testing of Bonds's samples with BALCO, and then return to Bonds to report the results.[11] And, of course, Anderson did not act gratuitously; he was paid a yearly stipend, plus a bonus and a valuable ring for helping in Bonds's fitness program.

I need not quarrel with the majority's analysis of whether Anderson was an employee; he was clearly an agent, which is enough to allow admission into evidence of his statements and have the issue of agency submitted to a jury. But even as to the employment issue, the majority misapplies the correct standard of review. Specifically, the majority admits that the fact Bonds paid Anderson annually supports finding an employment relationship, Majority Op. at 8572, but omits the fact that the district court never considered that fact and worse —the district court found Bonds had *not* paid Anderson. The district court based its holding on its finding that it was not evident Bonds ever paid Anderson or that if he did, Bonds only gave Anderson a ring worth $3,000. *Bonds*, 2009 WL 416445, at *5.

This finding of fact is clearly erroneous. Bonds's testimony shows he did pay Anderson $15,000 annually for the six years beginning in 1998 and ending in 2003. Bonds also paid Anderson $20,000 as a bonus when Bonds broke the single season home run record in 2001. In response to a question

---

[11]The majority writes *Itzhaki* has no relevance here because it involved an objection to evidence at trial and not a motion in limine. Majority Op. 8575. The majority provides no authority for this distinction and there is none. The issue whether there is sufficient foundational evidence of the existence of an agency relationship to admit into evidence statements by the alleged agent is the same at trial and in a motion in limine. *See* Advisory Committee Notes, 2000 Amendment, Fed. R. Evid. 103 (equating "rulings on evidence whether they occur at or before trial, including so-called 'in limine' rulings").

from a grand juror, Bonds testified he paid his other trainers, whom he considered to be employees, similar amounts. The majority asserts "Bonds paid gratuitously," Majority Op. at 8572, which suggests Bonds did not receive any return value from Anderson, but that claim is implausible: Bonds received, at a minimum, weight training coaching from Anderson, creams, and a liquid; and, performance of the sample testing Task. Of course, had the district court considered the evidence of Bonds's payments, it may also have found the payments were in part for Anderson to obtain the test results that helped Anderson monitor Bonds's nutritional requirements, and later to verify that Bonds had not taken steroids in case the tests run by Major League Baseball came back positive for steroids. Instead of acknowledging the district court's clear error and then deciding whether that error was prejudicial to the government, the majority ignores the error and reviews the district court's legal conclusion deferentially. Majority Op. at 8572 (searching only for a "sufficient basis" for the district court's holding).

In summary then, the district court abused its discretion because, by holding that statements by independent contractors are inadmissible under Rule 801(d)(2)(D), the court failed to identify the correct legal standard: independent contractors can be agents for purposes of imputation of statements to a principal. *See Hinkson*, 585 F.3d at 1262. This is reversible error because it prejudiced the government's rights; in other words, the district court may have ruled in the government's favor had the district court applied the correct standard of law to these facts. The majority itself admits: "the district court might, in the exercise of its discretion, have reached a different decision." Majority Op. at 8576. The error more likely than not prejudiced the rights of the government. *See Hinkson*, 585 F.3d at 1282. At the very least, we should remand to the district court to decide, for the first time, whether Anderson qualified as an agent irrespective of whether he was an independent contractor.

(c) *Anderson acted on Bonds's behalf, or for his benefit*. Anderson performed his Task so that Bonds would better be able to manage his nutrition and diet. The parties do not dispute that Anderson acted on Bonds's behalf.

(d) *Anderson consented to perform the Task*. Bonds testified that Anderson took Bonds's samples and reported back with the results, and Valente testified that Anderson arrived at BALCO with blood and urine samples that Anderson identified as Bonds's. Anderson's performance is sufficient to show his consent. Restatement (Third) of Agency § 1.01 cmt. c.

Therefore, Anderson was Bonds's agent for the purpose of the Task. This conclusion is obvious if one considers similar facts in a slightly different legal context. Imagine that Anderson were not quite so loyal. Had Anderson sold documents showing Bonds tested positive for steroids to a celebrity gossip publication, would Bonds have a cause of action against Anderson for breach of Anderson's duty of confidentiality? Yes: "An agent's relationship with a principal may result in the agent learning information about the principal's health, life history, and personal preferences that the agent should reasonably understand the principal expects the agent to keep confidential. An agent's duty of confidentiality extends to all such information concerning a principal even when it is not otherwise connected with the subject matter of the agency relationship." Restatement (Third) of Agency § 8.05 cmt. c. Bonds could assert a cause of action only if Anderson were his *agent*, but I have no doubt a court evaluating Bonds's relationship with Anderson in that context would hold Anderson was Bonds's agent for the purpose of the Task. It would not even be necessary for Bonds to adduce facts supporting the claim that Anderson was his friend or trainer.

(2) *Anderson's statements to Valente concerned, or were related to, a matter within the scope of Anderson's authority.* The district court erred on an issue of law in holding the gov-

ernment failed to show the task of identifying Bonds's sam-
ples was *within the scope* of the Task he gave Anderson. *See
Bonds*, 2009 WL 416445, at *5 ("The government has not
established by a preponderance of the evidence that Anderson
was defendant's agent or that the task of identifying defen-
dant's samples *was within the scope* of Anderson's agency"
(emphasis added)). Under Rule 801(d)(2)(D), the proffering
party must show the statement is *related to a matter* within
the agent's scope of authority, not that making the statement
is itself *within the scope* of authority. *Hoptowit v. Ray*, 682
F.2d 1237, 1262 (9th Cir. 1982) (holding Rule 801(d)(2)(D)
"does not require a showing that the statement is within the
scope of the declarant's agency. Rather, it need only be shown
that the statement be *related to a matter* within the scope of
the agency." (emphasis added)). Anderson's statements are
related to the scope of his agency because it was pertinent for
Anderson to tell BALCO from whom the samples were taken
to have BALCO accurately label the test results, so Anderson
could accurately report to Bonds the results of the tests on the
samples.

The district court's error is not harmless because it may
have admitted into evidence Anderson's statements if it had
considered whether they were related to a matter within the
scope of his agency and did not take an incorrectly restrictive
view of what types of statements were admissible into evi-
dence under Rule 801(d)(2)(D).

(3) *It is undisputed the statements were made during the
existence of the agency relationship between Bonds and
Anderson*.

Therefore, as Anderson's statements meet the three require-
ments under Rule 801(d)(2)(D) for admitting in evidence
Anderson's statements to Valente identifying the samples as
Bonds's, the district court's decision to exclude such testi-
mony should be reversed. The district court erred as to a mat-
ter of law by holding independent contractors could not be

agents and by holding that statements admissible under Rule
801(d)(2)(D) must be made within the scope of the agency
relationship. The district court also clearly erred when it
found there was no evidence that Bonds paid Anderson, with
the exception of a ring worth $3,000.

Because the district court erred as to a matter of law, the
majority is wrong to apply a deferential standard of review.
Moreover, the majority fails in its attempt to distinguish *Jones*
or *Itzhaki*, two cases where the agency relationship at issue
was far more attenuated than is the case here. Reviewing the
record below to determine only if the district court's mis-
statements of law caused the government prejudice, the
ineluctable conclusion is that the district court's error did
prejudice the government and its decision should be reversed.

### D. The evidence is also admissible under Rule 801(d)(2)(C) (authorized admissions) because Bonds authorized Anderson to tell BALCO the samples were Bonds's.

"A statement by a person authorized by the party to make
a statement concerning the subject" is not hearsay. Rule
801(d)(2)(C). Anderson's statements to Valente identifying
blood and urine samples are not hearsay under Rule
801(d)(2)(C) because Bonds impliedly authorized Anderson
to make those statements. Bonds's testimony shows he
impliedly authorized Anderson to have Bonds's bodily fluids
tested by BALCO and to report the results to Bonds so Bonds
could know the test results. Anderson's statements identifying
Bonds's samples concerned the subject of his Task.

To qualify a statement under this rule, the proffering party
must show the declarant had "authority to speak on a particu-
lar subject on behalf of someone else." *Precision Piping &
Instr., Inc. v. E.I. du Pont de Nemours & Co.*, 951 F.2d 613,
619 (4th Cir. 1991).[12] In practice, courts determine whether

---

[12]There is a dearth of Circuit case law explaining Rule 801(d)(2)(C).
Because there are few pertinent cases, I turn to out-of-circuit authority to
examine the dimensions of this rule.

the declarant was authorized to speak based on the *nature of the relationship* between the party and the declarant, or based on the *nature of the task* the declarant was to perform. *See* Christopher B. Mueller and Laird C. Kirkpatrick, *Federal Evidence* § 8:50 (2008). The majority errs in stating the applicable law by importing, without citation, the requirement authority to speak on behalf of the principal be "specific" or done "specifically," whatever that might mean.[13] Majority Op. at 8567-69.

Courts have admitted in evidence statements made by declarants authorized to perform a particular task, when the nature of the task implies the authority to speak. *E.g. United States v. Iaconetti*, 540 F.2d 574, 577 (2d Cir. 1976); *see also Reid Bros. Logging Co. v. Ketchikan Pulp Co.*, 699 F.2d 1292, 1306 (9th Cir. 1982). In these cases, the scope of authority was much narrower than in the cases where the role of the declarant—i.e., the nature of the *relationship*—was to speak for the party against whom the statement was offered. Yet in each case, the nature of the *task* entrusted to the declarant impliedly carried with it the authority to speak for the party who had authorized the task. The extent of the authority to speak is implied from the nature of the task and not exclusively by the occupation of the declarant, nor the nature of the relationship between the declarant and the person who impliedly authorized him to speak.

In *Iaconetti*, a government inspector was convicted of having solicited and received a bribe. 540 F.2d at 575. Defendant

---

**[13]**It is not clear whether the "specific" requirement is meant in the sense of "expressly" authorized (as opposed to "impliedly" authorized), or in the sense of "particularly" authorized (as opposed to "generally" authorized).

For purposes of determining what was authorized there is no rule of agency law of which I know that determines an agent is unauthorized unless he is given "specific" authority to do a task. When a clerk is asked to mail a letter, is he not authorized to place a stamp on it unless he is "specifically" told to use a stamp?

Iaconetti was assigned to conduct a survey of a company to determine whether it was capable of performing a contract upon which it had successfully bid. *Id.* at 576. Iaconetti met with Lioi, President of the company, and intimated he would assure a favorable report on the company if the company paid Iaconetti one percent of the contract price. *Id.* Lioi told two of his business partners, Babiuk and Goldman, and his lawyer Stern, about Iaconetti's solicitation of a bribe. *Id.* Lioi then told the FBI, who had him audio-record his meeting with Iaconetti where Lioi gave Iaconetti the bribe money. *Id.* The FBI arrested Iaconetti after he received the money from Lioi. *Id.*

The government's chief witness at trial was Lioi. *Id.* Defense counsel sought to impeach Lioi by suggesting on cross-examination that Lioi, rather than defendant Iaconetti, had initiated the scheme to pay the bribe. *Id.* To rebut this defense assertion and to corroborate Lioi's testimony, the government put on Goldman and Stern, who testified that Lioi had told them Iaconetti had asked for the bribe. *Id.* The district court denied Iaconetti's post-conviction motion for a new trial made on the grounds that Goldman's testimony was inadmissible hearsay. *Id.* at 576-77.

The Second Circuit affirmed, holding Goldman's testimony was admissible under Rule 801(d)(2)(C) because "by demanding the bribe Iaconetti necessarily authorized the persons who ran the business to discuss his demand among themselves." *Id.* at 577.[14] Attorney Stern's testimony, that Lioi had told him of Iaconetti's bribe request, however, was inadmissible under Rule 801(d)(2)(C) because it was not necessary for Lioi to consult with his personal attorney as to whether to pay

---

[14]Note that the Second Circuit held Iaconetti "necessarily authorized" Lioi, not "specifically" authorized, nor "expressly authorized." *Id.* at 577. In determining what, under the circumstances, was impliedly authorized, one considers what was necessary or normal. One does not insert requirements of "specificity," from sources unidentified, as a consideration.

Iaconetti the bribe. On the other hand, it *was* necessary for Lioi to relay the bribe request to his business associates because their assent was necessary to get the money to pay the bribe. *Id.* at 577-78.

Similarly, by asking Anderson to deliver blood samples to BALCO for testing and to report the results back to Bonds, Bonds necessarily authorized Anderson to identify the source of the blood; otherwise, Bonds could not be assured of the accuracy of the results, which was the whole purpose of the Task entrusted by Bonds to Anderson. Without identification of who had supplied the samples, Anderson's Task would have been a fool's errand.

Our most extensive discussion of Rule 801(d)(2)(C) is found in *Reid Bros.* Reid Brothers Logging Co. sued two pulp companies for violations of the Sherman Act. 699 F.2d at 1295. The district court found the pulp company defendants had conspired to dominate all segments of the southeast Alaska timber industry. *Id.* On appeal, the defendants challenged on hearsay grounds the district court's admission of a report that was material to show defendants engaged in predatory pricing. *Id.* at 1306 ("[T]he report . . . provided the sole support for the district court's finding that the defendants purposefully set log prices at levels below market value."). We held the report was admissible under Rule 801(d)(2)(C). *Id.* The report had been prepared by an employee of the Oji Paper Company of Japan. *Id.* Oji Paper Company was a shareholder of defendant-ALP's parent company. *Id.* The report was prepared at the request of ALP's chairman. *Id.* The Oji Paper Company employee who prepared the report was given access to ALP's books and records and accompanied ALP employees to logging camps. *Id.* He presented the report to a meeting of the ALP Log Committee and the report was circulated to ALP officers and managers. *Id.* Based on those facts, we held "there can be little question that [the employee] was 'authorized' by ALP to make statements regarding the entire scope of ALP's woods operations." *Id.*

In *Reid Brothers*, ALP authorized declarant—the Oji Paper Company employee—to produce a report of ALP's woods operations, including the price structure for the purchase of logs, to further ALP's knowledge of how best to conduct its business. Similarly, Bonds authorized Anderson to deal with BALCO to produce test results of Bonds, to further Bonds's knowledge of how best to modify his nutritional intake. Oji Paper Company employee's statements regarding the price structure of ALP's purchase of logs were necessary to make his report accurate. Anderson's statements regarding Bonds's name were necessary to make his report of Bonds's test results accurate. In *Reid Brothers*, it was not necessary for the plaintiffs who offered into evidence the Oji Paper Company employee's statements to show ALP specifically authorized Oji Paper Company employee's statements regarding the price structure of log purchases; it was sufficient that ALP authorized a survey of its own log operations from which said price information came. Here, Bonds authorized a review of his nutritional levels and Anderson's statements in further-ance of accurately assessing his nutritional levels were thereby impliedly authorized.

With these cases in mind, I turn to the district court's analy-sis of whether Anderson's statements are admissible under Rule 801(d)(2)(C).

I begin with the district court's most serious error, which pervades its analysis of the admissibility into evidence of Anderson's statements—that it focused solely on whether the nature of Anderson's role *as a trainer* authorized him to speak on Bonds's behalf. In doing so, the district court overlooked the undisputed evidence as to the full nature of Anderson's Task with BALCO. So does the majority. *See* Majority Op. at 8567-68. Anderson's formal label as a trainer should not trump the actual function he performed for Bonds. For Ander-son to accomplish his Task successfully, it was necessary for Anderson to identify the samples in a manner that would later allow BALCO accurately to report test results back to Ander-

son and for Anderson to know the results were of Bonds's samples, so he could accurately report to Bonds his BALCO results.

But the district court did not look to the full Task; it stated: "[t]he rationale for Rule 801(d)(2)(C) simply does not apply here. If a party authorizes a declarant to speak on his behalf and the declarant makes an admission, Rule 801(d)(2)(C) provides a mechanism for that admission to be used against the party. Trainers, unlike lawyers, brokers, sales personnel, and those with supervisory responsibilities, are not generally authorized to speak for principals." 2009 WL 416445, at *5. The district court's standard—that trainers are not generally authorized to speak for their trainees—is correct, but only if read in isolation. The district court does not explain how that *general* standard applies to this particular case. We are left to guess why the district court reached the conclusion that Anderson was not authorized based on this general standard.

One possible interpretation of the district court's opinion is that the district court simply ignored the word "generally" in its statement of the law. If the district court proceeded with its analysis on the grounds that "trainers . . . are not [ ] authorized to speak for principals," that is a ruling on a question of law; we then review that ruling de novo. *See Hinkson*, 585 F.3d at 1262. The holding that trainers are not authorized to speak for trainees is incorrect because no rule of law prohibits a trainee from authorizing his trainer to speak for the trainee. It is true only that the duties of a trainer do not usually include making statements to third parties. Furthermore, this holding is incorrect because a person may be authorized to speak on behalf of a principal independently from that person's role as a trainer. The fact that Anderson was also Bonds's trainer should not preclude the district court from holding that Bonds authorized his friend Anderson to perform the Task. For instance, if Bonds had told a John Smith to speak on his behalf at a press conference, and John Smith happened to be the batboy for the San Francisco Giants, John Smith's profes-

sion as batboy would not undercut Bonds's authorization of Smith to speak on his behalf, although batboys as a group and profession are not usually thought of as ballplayers' spokesmen.

The other possible interpretation of the district court's opinion is that the district court applied the correct standard of law, but found the facts on this record were inadequate to fit Anderson's statements into an exception to the general standard that trainers are not generally authorized to speak on behalf of their trainees. This is an application of the law to the facts, which we review for clear error under *Hinkson*, 585 F.3d at 1262. The district court clearly erred because its application was illogical; all reasonable inferences that may be drawn from facts in the record show that Anderson was authorized to speak, not as Bonds's trainer, but as the person Bonds entrusted to complete the Task. It was clear error for the district court to limit its consideration to Anderson's *role* as a trainer, without considering what facts established his implied authority to speak for Bonds: the *nature of the Task* entrusted to Anderson by Bonds.

Earlier in the district court's opinion, it described the nature of the task Anderson was required to perform as "the delivery of defendant's samples to BALCO." 2009 WL 416445, at *5. This is a finding of fact, as to what constituted Anderson's task, which we review for clear error. *Hinkson*, 585 F.3d at 1263. But, the district court did clearly err in finding Anderson's task was mere delivery of samples to BALCO because the record shows Anderson's Task included far more—from procuring the vials to reporting the results to Bonds—as discussed earlier in this dissent. *See* discussion *supra* p. 8585-86.

The district court committed another error of law in holding Anderson was not authorized to identify Bonds by name because Bonds provided Anderson with blood and urine samples in response to requests *from Anderson*, rather than had the request originated *from Bonds*. The district court stated:

"[Bonds's] testimony establishes that he provided the samples in response to a request from Anderson, not that defendant hired Anderson to perform this task." *Bonds*, 2009 WL 416445, at *5. Although the district court's statement is phrased as a finding of fact, the district court implicitly holds that, as a matter of law, admission into evidence of statements under Rule 801(d)(2)(C) requires that (1) the person authorizing the speaker must not be acting in response to a request from the speaker himself and (2) that authorization is synonymous with *hiring* a speaker to perform a task. These are legal issues that we review de novo. There is no support for a requirement that an impliedly authorized declarant cannot suggest the task in the first place. In *Reid Bros.*, we did state that the report admitted under Rule 801(d)(2)(C) was conducted at the request of the company's CEO, but I see no reason why our analysis would have been different if Oji Paper Company of Japan had approached ALP first and offered to draft the report, so long as the principal assented to the declarant's performance of the task. *See* 699 F.2d at 1306. The reference in *Reid Bros.* to the company's request shows only that party-ALP actually authorized the report and that the consultant did not write it spontaneously on his own. Here, Bonds's own testimony shows he authorized Anderson to procure BALCO testing of Bonds's bodily fluids; Bonds impliedly authorized Anderson to identify the samples to insure the accuracy of the test results as to *his* bodily fluids. The only determinative factor is whether Bonds *agreed* to Anderson's suggestion, which he did.[15]

---

[15]The fact that Anderson suggested the task might be relevant if there were some dispute over the *scope* of the task. In that case the issue of who initially suggested the task might be probative of whether there was a meeting of the minds as to the scope of Anderson's authority. Here, however, we consider the scope of the task solely from Bonds's own testimony and it is Bonds who claims he entrusted Anderson with the Task. Therefore, there is no dispute over the scope of the task and we may properly decide solely from Bonds's testimony to the grand jury what statements were impliedly authorized as part of that Task.

The majority attempts to distinguish *Iaconetti* on the same grounds. Majority Op. at 8567-68. Whereas defendant-Iaconetti demanded a bribe, it was Anderson who raised the possibility of testing Bonds's blood. But, the majority misses the point of *Iaconetti*. Iaconetti gave Lioi, the company president, the task of getting the bribe money from the company. To accomplish that task, Iaconetti impliedly authorized Lioi to pass his demand for money to the people who controlled the company's money, including witness-Goldman. Here, Bonds gave Anderson the task of testing Bonds's bodily fluids and reporting the results. Just as it was necessary for Lioi to pass on Iaconetti's demands to the people in the company who could pay the money, it was necessary for Anderson to identify the source of the bodily fluids to the laboratory that would test the samples. Otherwise, Anderson could not achieve an accurate completion of the Task of testing and reporting.

Moreover, the majority simply has its facts wrong when it writes the steroid testing was all Anderson's idea, Majority Op. at 8567-68: Bonds testified it was *his* idea to have his blood tested for steroids at BALCO after Major League Baseball collected his blood on May 29, 2003. Bonds wanted to keep Major League Baseball honest. The majority contends this fact, and presumably anything that occurred after 2002, is not relevant, but does not explain why. Evidence that Bonds expected Anderson to be able to test his blood for steroids, and that he would initiate a request for such testing, is probative of his entire relationship with Anderson, where there is not a scintilla of evidence the relationship between Anderson and Bonds changed after 2002. To the contrary, it was in 2003, after the World Series of 2002, and when Bonds hit 73 home runs, that Bonds bestowed a World Series ring and a $20,000 bonus on Anderson.

There is likewise no support for the district court's implicit holding that a party must have *hired* a speaker for the speaker's statements to be authorized. "To hire" suggests payment.

*See* Webster's Third New International Dictionary 1072 (1965) (Hire: "To engage the personal services of for a fixed sum: employ for wages"). But payment is not a requirement under Rule 801(d)(2)(C). *Iaconetti*, 540 F.2d at 575-76 (finding statements were authorized even though Iaconetti did not pay Lioi to relay his bribe money demand to Lioi's business associates).

Next, the district court clearly erred when it found Bonds's "equivocal answers about the number of samples [Bonds] gave Anderson [were] not sufficiently certain to establish Anderson had authority to speak with regard to the particular samples at issue here." *Bonds*, 2009 WL 416445, at *5. The majority adopts and repeats this error. Majority Op. at 8568-69. Without further analysis, this is simply a non-sequitur. Neither the district court nor the majority explain why Bonds's uncertain memory as to the *number* of samples given cuts against a finding that he authorized Anderson. As such, the district court clearly erred by misapplying the law to these facts because it is illogical to hold Anderson's statements are not admissible into evidence based on a non-sequitur.

I can imagine one situation where the number of times Bonds authorized Anderson to perform the Task would matter. If Bonds testified he gave Anderson samples on only *three* occasions, and Anderson submitted to BALCO samples on *four* occasions—samples that he claimed were Bonds's—then there would be some reason to suspect Anderson was not authorized to make identifying statements on one occasion. In that situation, the district court might not be able to identify and rule out which test was unauthorized, and therefore it might be reasonable to exclude all of Anderson's identifying statements.

But that situation is not relevant here. Not only was a "three of four" situation not discussed by Bonds before the district court or this court, but the record does not provide any basis

for a claim that Anderson delivered more samples than Bonds authorized to be tested. Remember, the record is clear and undisputed that *each* sample was gathered from Bonds's doctor at Bonds's home contemporaneously, in Bonds's presence, with Bonds donating the sample. As Bonds testified regarding the collection of his blood and urine samples: "[W]e just gave it to Greg [Anderson]." The factual record is without dispute: Each and every sample was collected with Bonds's cooperation and consent. There is not a word in the record that Anderson handled anybody else's samples, or what possible motivation he could have had to frame Bonds with another's blood. Just the opposite. Anderson has been willing to stay in jail for an extended period for contempt of court to avoid testifying against Bonds.

The district court also erred—and here the majority agrees —on an issue of law in holding Anderson's statements were not an "admission" because the statement was not against Anderson's interest. Rule 801(d)(2)(C) does not require the statement to be against the declarant's interest. There is no requirement an authorized statement must be against the interest of either the speaker or the principal. *See, e.g., Reid Bros.*, 699 F.2d at 1306. I concede this error would not alone compel us to reverse the decision below, but it is cumulative with the numerous errors of law and fact in the district's court decision.

The majority adds a whole new erroneous contention to the district court's errors: it relies on the notion that Bonds was just "accommodating the wishes of a friend." Majority Op. at 8568. Perhaps I spend my time in the wrong social circles, but in my experience "accommodating the wishes of a friend" has never quite included giving friends my blood or urine; a screwdriver or a ride if his car breaks down, sure, but not vials of my bodily fluids. But, even if giving away blood and urine is something now done among friends, I do not see how "accommodating the wishes of a friend" is necessarily exclusive of "providing Anderson with the authority to speak." *Id.*

(internal quotation marks omitted). The majority suggests Bonds had nothing to gain from Anderson's Task. That is flat wrong: Bonds testified he gave Anderson his blood and urine samples for the ostensible reason that he expected the test results to help him improve his nutrition. Bonds testified: "I was just baffled like, you know, should have been doing this a long time ago, you know, drawing blood, finding out what you're lacking and stuff, you know, keep your energy up if you're this or that." Later, Bonds expected the test results to keep Major League Baseball honest when it performed its unannounced steroid test.

Finally, the majority contends Anderson was not impliedly authorized to identify Bonds's samples because Anderson *could* have provided BALCO the samples anonymously. The majority does not rely on any authority for its contention, which is inconsistent with *Iaconetti* and *Reid Bros.*; in neither of those cases did the court rule out all hypotheses as to how the statements could have been made, but were not. In *Iaconetti*, for example, the speaker, Lioi, told his business partners that he needed to collect company money to pay Iaconetti's bribe. Although the Second Circuit found those statements were necessarily authorized, the majority's analysis here would compel a different result. Lioi *could* have lied to his business partners about the need for the money. He *could* have said it was needed for an unexpected emergency—e.g., that a valued employee needed uncovered medical treatment. This type of second-guessing whether a statement is strictly necessary would eliminate the admissibility of all statements impliedly authorized, because whenever the party authorizing a statement does not draft the exact words of a statement, another formulation of the statement is possible. Instead, *Iaconetti* and *Reid Bros.* hold that statements may be impliedly authorized so long as they are made to complete a task in the ordinary and usual manner.

The assertion that Anderson could provide Bonds's samples anonymously is also unsupported on the record. It is not

evident that BALCO would have tested random samples provided by Anderson, without the cachet of Bonds's name. Moreover, Bonds testified that he did not request or expect Anderson to keep his identity confidential. To the contrary, Bonds revealed his identity when he met with the CEO of BALCO to discuss his testing and when he publicly spoke about it in an advertisement for BALCO.

If Anderson's sole task were to deliver the samples to BALCO, I would agree with the district court's determination as to lack of authorization of Anderson to speak for Bonds to identify the donor of the samples: couriers and postal workers are not impliedly authorized to make statements as to the parcel's provenance on behalf of the people from whom they take parcels and make deliveries. *See* Restatement (Third) of Agency § 1.01 cmt. h (2006). It is not necessary for a courier to identify the source of a letter or package. Indeed, in most cases the courier has no personal knowledge who delivered the goods to the office for the final delivery. But, as the elements of Anderson's Task reveal—when that Task is at last fully described—Anderson was much more than a courier. He was responsible for *dealing* with BALCO under highly specific conditions of delivery—conditions set by Bonds (samples to be picked up at Bonds's home) and BALCO (samples to be tested within thirty minutes of extraction), but *not* set by Anderson. He was also responsible for reporting back the results of Bonds's tests. Bonds testified: "[Greg Anderson] came in with the vials, my doctor drew the blood, we just gave it to Greg. Greg went down there and *dealt* with it" (emphasis added). The authority to *deal* with a third party is a classic element of authorizing a person to act for another.[16]

---

[16]Admittedly, the distinction between an authorized speaker under Rule 801(d)(2)(C) and an agent under Rule 801(d)(2)(D) appears blurry when discussing "authorization." These roles are distinguished, however, by the fact that an authorized speaker under Rule 801(d)(2)(C) is not necessarily subject to the other requirements necessary for agency under Rule 801(d)(2)(D).

*See* Restatement (Third) of Agency § 1.01 cmt. c ("Authors, performers, and athletes often retain specialized agents to represent their interests in dealing with third parties . . . . [A] relationship of agency always contemplates three parties—the principal, the agent, and the third party with whom the agent is to *deal*." (internal quotation marks omitted) (emphasis added)).

   The district court's errors of law and fact require reversal. In deciding an interlocutory appeal, we will reverse an evidentiary ruling for abuse of discretion only if such nonconstitutional error more likely than not would affect the outcome of the case. *See Hinkson*, 585 F.3d at 1282. A preponderance of the evidence proves Bonds authorized Anderson to perform the task, which impliedly authorized Anderson to identify the origin of the samples he delivered to BALCO. The district court's incorrect reading of the law and clear errors of fact affected and effected its erroneous decision. Therefore, I would reverse the district court's decision not to admit Anderson's statements under Rule 801(d)(2)(C).

## IV.   Conclusion

   The district court's errors in labeling Anderson's statements—identifying blood and urine samples handed by Anderson to Valente at BALCO as Bonds's—as hearsay contravene Rules 801(d)(2)(C) (authorized admissions) and 801(d)(2)(D) (statements of an agent related to the subject of his agency). As to both Rules, the district court has erred as to (1) the correct legal standard to be applied, and (2) its findings of fact.

   First, upon the more commonly visited hearsay exception, Anderson's statements to Valente: (1) were made while Anderson was Bonds's agent, in dealing with BALCO for the production of accurate test results of Bonds's bodily fluids; and (2) were related to the scope of his agency—to help

Bonds get accurate readings of his nutritional levels. *See* Rule 801(d)(2)(D).

Second, upon the less common hearsay exception, Anderson's statements to Valente were impliedly authorized by Bonds as a normal and necessary action for the procurement of accurate test results of Bonds's bodily fluids. *See* Rule 801(d)(2)(C).[17]

We should reverse the district court's decision to exclude Anderson's foundational statements regarding the provenance of the blood and urine samples that Anderson brought to BALCO. Those statements are admissible in evidence under both Rules 801(d)(2)(C) and 801(d)(2)(D). But, even if I am wrong to think the evidence is conclusive in the government's favor, it is at least strong enough to merit remanding this issue to the district court to decide whether, under the correct standard of law, Anderson was Bonds's agent, or whether Bonds authorized Anderson to perform his Task.

Although we should reverse as to Anderson's statements, that does not mean we should hold the BALCO logs and test results admissible in evidence at this point. Bonds raised before the district court several other reasons why that evidence should not be admitted in evidence. The district court did not reach those issues because it decided that Anderson's statements were inadmissible. Thus, if this case were remanded, the district court would have to decide whether the evidence proffered by the government is admissible in evidence *if* Anderson's statements are admissible in evidence.

---

[17]Finally, like the majority, I do not think the district court erred in deciding the government's evidence was not admissible under the business records exception, Rule 803(6), or the residual exception, Rule 807.